**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Rockland Convenience Store

    v.                                    Civil No. 10-cv-260-LM

United States; the Department of
Agriculture; Food and Nutrition
Service; and Northeast Region
Compliance Center


**O R D E R**


    Rockland Convenience Store ("Rockland") appeals a decision

of the United States Department of Agriculture ("USDA") to

permanently disqualify Rockland from participating in the

Supplemental Nutrition Assistance Program ("SNAP"), established

under the Food Stamp Act of 1964, 7 U.S.C. §§ 2011-2036, and

operated by the USDA's Food and Nutrition Service ("FNS").

Before the court is defendants' motion for summary judgment.

Rockland objects.  For the reasons that follow, defendants'

motion for summary judgment is granted.


**Summary Judgment Standard**

    Summary judgment shall be granted "if the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  "An issue is genuine if 'the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.'" Chadwick v. WellPoint, Inc., 561 F.3d 38, 43 (1st Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997)) (internal quotation marks and brackets omitted). "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion,'" Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)), and "cannot rest on 'conclusory allegations, improbable

inferences, [or] unsupported speculation,'" Meuser, 564 F.3d at
515 (quoting Welch v. Ciampa, 542 F.3d 927, 935 (1st Cir.
2008)).  When ruling on a party's motion for summary judgment, a
trial court "constru[es] the record in the light most favorable
to the nonmovant and resolv[es] all reasonable inferences in
[that] party's favor."  Meuser, 564 F.3d at 515 (citing
Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38
(1st Cir. 2002)).

## Background

This case arises out of a decision by the USDA to
disqualify Rockland from its status as a food store approved for
participation in the SNAP.

### A. SNAP Benefits

SNAP is designed to "permit low-income households to obtain
a more nutritious diet through normal channels of trade by
increasing food purchasing power for all eligible households who
apply for participation."  7 U.S.C. § 2011.  SNAP benefits are
provided to eligible households by means of electronic benefit
transfer ("EBT") cards.  See 7 U.S.C. §§ 2012(i), 2016(a).  "The
EBT system is the modern replacement for traditional paper food
stamps."  Idias v. United States, 359 F.3d 695, 696 (4th Cir.
2004).  It "utilizes plastic cards which are 'swiped' at the
cash register like a credit card."  McClain's Mkt. v. United

States, 411 F. Supp. 2d 772, 773 n.2 (N.D. Ohio 2005) (citation to the record omitted).

EBT cards, in turn, may be used "only to purchase food in retail food stores which have been approved for participation in [SNAP]." 7 U.S.C. § 2016(b). EBT cards "may be accepted . . . only in exchange for eligible food," 7 C.F.R. § 278.2(a), which means that, as a general rule, EBT cards "may not be accepted in exchange for cash,"[1] id. In addition, SNAP "benefits shall not be accepted . . . in payment for items sold to a household on credit." 7 C.F.R. § 278(f).

The statutes governing SNAP benefits also provide that if an approved food store violates the applicable statutes or regulations, it may be disqualified from participating in the program, assessed a civil money penalty, or both. See 7 U.S.C. § 2021(a). An approved food store can be disqualified for "trafficking" in benefits, see 7 U.S.C. § 2021(b)(3)(B), which is defined to include "the buying or selling of coupons . . . or other benefit instruments for cash or consideration other than eligible food," 7 C.F.R. § 271.2. In one common scenario, trafficking is afoot when a store "accept[s] food stamps for sales that never took place, while customers . . . receiv[e]

---

[1] The one exception to this general rule allows stores to make change amounting to less than one dollar when conducting SNAP transactions. See 7 C.F.R. § 278.2(d).

cash instead of merchandise." Idias, 359 F.3d at 698; see also R & T Mini Mart, Inc. v. U.S. Dep't of Agric., Food & Nutrition Serv., No. 07-15171, 2008 WL 108592, at *1 (E.D. Mich. Jan 2. 2008) (defining "food stamp trafficking" as "the redemption of food stamps at a discount for cash"). A food store may also be disqualified for accepting SNAP benefits to pay for items sold on credit. See 7 C.F.R. § 278(f).

For trafficking in SNAP benefits, a food store shall be disqualified permanently, unless "the Secretary [of Agriculture] determines that there is substantial evidence that such store . . . had an effective policy and program in effect to prevent violation of the [statute] and regulations." 7 U.S.C. § 2021(b)(3)(B). If the Secretary makes such a determination, he or she has the discretion to impose a civil money penalty in lieu of disqualification.[2] See id. For accepting SNAP benefits

---

[2] The "substantial evidence" on which the Secretary may base a decision to impose a civil money penalty in lieu of disqualification includes evidence that:

**(i)** the ownership of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; and

**(ii)(I)** the management of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; or

**(II)** the management was aware of, approved of, benefited from, or was involved in the conduct of no

to pay for items sold on credit, a food store "shall be disqualified from participation in [SNAP] for a period of one year." 7 C.F.R. § 278.2(f).

A food store that is disqualified pursuant to 7 U.S.C. § 2021(a) has a right to administrative review. See 7 U.S.C. § 2023(a)(3), (5)-(12). That administrative review, in turn, is subject to judicial review:

> **(13)** If the store . . . feels aggrieved by such final determination [i.e., the result of administrative review], it may obtain judicial review thereof by filing a complaint against the United States in the United States court for the district in which it resides or is engaged in business . . . requesting the court to set aside such determination.
>
> . . . .
>
> **(15)** The suit in the United States District Court . . . shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action . . .

7 U.S.C. 2023(a). A store seeking judicial review after an unsuccessful administrative review bears the burden of proving, by a preponderance of the evidence, that the agency's determination is invalid. See Fells v. United States, 627 F.3d 1250, 1253 (7th Cir. 2010); Kim v. United States, 121 F.3d 1269, 1272 (9th Cir. 1997); Warren v. United States, 932 F.2d 582, 586

---

more than 1 previous violation by the store or food concern.

7 U.S.C. § 2021(b)(3)(B). Eligibility for a civil money penalty in lieu of disqualification appears not to be an issue in this case.

(6th Cir. 1991); Modica v. United States, 518 F.2d 374, 376 (5th Cir. 1975) (citing Redmond v. United States, 507 F.2d 1007, 1011 (5th Cir. 1975)); Hajifarah v. United States, 779 F. Supp. 2d 191, 204 (D. Me. 2011).

Trial de novo, however, pertains only to judicial review of the USDA's determination that a violation took place. See Objio v. United States, 113 F. Supp. 2d 204, 208 (D. Mass. 2000) (describing First Circuit's standard of review in this areas as "bifurcated"). Once a court upholds the USDA's determination that a violation has taken place, review of the sanction imposed by the USDA is based on the administrative record, and the sanction may be overturned only if its imposition was arbitrary or capricious. See Hajifarah, 779 F. Supp. 2d at 208 n.11 (citing Wong v. United States, 859 F.2d 129, 132 (9th Cir. 1988)); see also Objio, 113 F. Supp. 2d at 208 (citing Broad St. Food Mkt. v. United States, 720 F.2d 217, 220 (1st Cir. 1983); Collazo v. United States, 668 F.2d 60, 65 (1st Cir. 1981); Kulkin v. Bergland, 626 F.2d 181, 184 (1st Cir. 1980)).

B. Enforcement

In some cases, the USDA has based a SNAP disqualification on an undercover FNS investigator's successful attempt(s) to exchange SNAP benefits for ineligible items. See, e.g., Atl. Deli & Grocery v. United States, Civil No. 10-4363 (JBS/AMD),

2011 WL 2038758, at *1 (D.N.J. May 23, 2011); Ratsamy v. United States, Civil No. 10-975 ADM/JJD, 2011 WL 1533170, at *1 (D. Minn. Apr. 21, 2011).  However, it is well established that a store can be held liable for trafficking even without being caught red-handed.  See Idias, 359 F.3d at 698 (citing Kahin v. United States, 101 F. Supp. 2d 1299, 1303-04 (S.D. Cal. 2000)); Young Choi, Inc. v. United States, 639 F. Supp. 2d 1169, 1178 (D. Haw. 2009).  This is because the Food Stamp Act expressly provides that disqualification from SNAP may be based on "facts established through on-site investigations, inconsistent redemption data, or evidence established through a transaction report under an electronic benefit transfer system."  7 U.S.C. § 2021(a)(2) (emphasis added); see also 7 C.F.R. § 278.6(a).

"Because EBT debits are electronically recorded, the records can be scanned by various computer programs for irregularities and abnormalities."  Idias, 359 F.3d at 696. "The stored electronic data includes the recipient's card number, the amount of the food stamp purchase, the store number, and the date and time of the transaction."  Young Choi, 639 F. Supp. 2d at 1173.  Those electronic data, in turn, "provide[ ] a tool for identifying the type and pattern of transaction indicative of food stamp trafficking."  Id.  FNS identifies

suspicious patterns of ETB card usage by using a "computer program known as the ALERT program."[3]  Id.

In Idias, the suspicious patterns included evidence that "large food stamp debits often occurred in quick succession, sometimes using the same EBT card, despite the Supermarket's modest size."  359 F.3d at 698.  In Young Choi, where the district court affirmed the USDA's disqualification decision, the USDA relied on ALERT reports showing "426 transactions recorded at Plaintiff's store . . . that show rapid and multiple transactions, large withdrawals, and transactions that depleted customers' available food stamp balances."  639 F. Supp. 2d at 1178.  In Hanna v. United States, the district court affirmed a disqualification decision that resulted from an investigation based on ALRRT reports showing:

> (i) an 'inordinate number' of EBT transactions in
> exact-dollar amounts; (ii) a number of instances of a
> single food stamp recipient engaging in multiple
> transactions within a relatively short time period;
> and (iii) a number of large purchases that exceeded
> the average purchase amount for a store the size of
> Plaintiff's establishment.

No. 04-74627, 2007 WL 1016988, at *2 (E.D. Mich. Mar. 30, 2007).
In Rodriguez Grocery & Deli v. United States, the suspect transactions consisted of:

---

[3] "The ALERT program is the **A**nti-fraud **L**ocator using the **E**lectronic Benefit Transfer **R**etailer **T**ransactions Program." Young Choi, 639 F. Supp. 2d at 1173 n.2.

> (1) 383 transactions [that] ended in "a same cents
> value,"[4] (2) 32 transactions [that] were "made too
> rapidly to be credible," (3) 154 transactions [that]
> were multiple transactions "made from individual
> benefit accounts" within 24 hours, and (4) 343
> transactions [that] were "excessively large."

2011 WL 1838290, at *1 (D. Md. May 12, 2011) (footnotes

omitted).

C. Rockland's Conduct

Defendants' motion for summary judgment includes a

statement of undisputed material facts as required by Local Rule

7.2(b)(1).  While Rockland's objection is based upon the

existence of genuine issues of material fact, it does not

incorporate the "short and concise statement of material facts"

required by Local Rule 7.2(b)(2).  That said, the following

facts are undisputed.

Rockland is a convenience store in Manchester, New

Hampshire.  It participated in SNAP from November of 2005 until

the date of the disqualification at issue here.  As a SNAP

participant, Rockland had a point-of-sale device for swiping the

EBT cards of SNAP benefit recipients.

---

[4] A $1.00 transaction has a "cents value" of 00, and
transactions with the same cents values, such as a $1.00
transaction, a $4.00 transaction, and a $12.00 transaction,
collectively are called "same-cents" transactions.

In 2006, Rockland had EBT sales of $4,036.67.  In 2007, it had EBT sales of $4,610.74.  In 2008, it had EBT sales of $7,063.47.  In 2009, Rockland's EBT sales rose to $73,661.87.

ALERT reports for Rockland for 2009 showed EBT sales of $8,620.53 for September, $8,781.52 for October, and $7,674.38 for November.  In other words, Rockland's EBT sales for each of those three months were greater than its EBT sales for the previous year.  And, Rockland's September and October EBT sales were each more than double the store's EBT sales for all of 2006.[5]

The ALERT reports also identified three unusual patterns: (1) a statistically large number of "same-cents" transactions, and, in particular, transactions with "cents values" of 00, 50, and 99; (2) transactions separated by a short amount of time, often less than one minute; and (3) a statistically large number of high-dollar transactions.  Based upon those statistical

---

[5] While the USDA did not base its disqualification decision on the sharp increase in Rockland's redemptions, such a pattern is of concern:

> A store's "relatively high food stamp redemption rate" may "be[ ] the result of unusually heavy patronage by food stamp recipients."  Carlson v. United States, 879 F.2d 261, 264 (7th Cir. 1989).  But absent another plausible explanation, a high redemption rate also indicates trafficking.

Rodriguez, 2011 WL 1838290, at *4.

anomalies, FNS sent Program Specialist Phyllis Svenson to visit
Rockland.

Svenson observed that Rockland had no shopping carts or
baskets, and no optical scanner.  She determined that
approximately sixty percent of the merchandise on display and in
the store's back room was beer.  She further observed no meat
except for bologna, hot dogs, canned spam, and tuna; one bunch
of bananas; some canned fruit and vegetables; five loaves of
bread; a few items of Indian/Nepalese spices; and four twenty-
pound bags of rice.  Regarding prices, Svenson noted
heterogeneity in the cents values of Rockland's merchandise and
that the store's three most expensive eligible items were: (1)
bags of rice priced at twenty dollars; (2) bottles of vegetable
oil priced at $4.99; and (3) bottles of apple juice priced at
$4.49.  Svenson spoke with an employee who told her that
Rockland did "not really" extend credit, did not engage in
transaction rounding, and did not take telephone orders.

Svenson's report also identified various same-cents,
successive, and large transactions which, in her opinion,
represented abnormal shopping patterns.  With regard to same-
cents transactions, she identified one household that conducted
two even-dollar same-cents transactions within eleven minutes on
the same day, and another household that had two separate
transactions, each for exactly $37.99, in September of 2009.

With regard to successive transactions, she identified, among others, a $233.77 transaction that followed a previous transaction by a mere sixty-one seconds.  Finally, she noted nineteen transactions of more than forty-four dollars each, in a store where the most expensive eligible item – of which there were only four in stock on the day of her visit – cost twenty dollars.

Based on the ALERT report and Svenson's site visit, FNS Supervisory Program Specialist Robert Hughes wrote to Rockland's owner, Shova Karki, to inform her that Rockland was being charged with trafficking in SNAP benefits.  In addition, Hughes identified the transactions that formed the basis for the charge:

> 1. In a series of Supplemental Nutrition Assistance Program EBT transactions, there were an unusual number of transactions ending in a same cents value.  These transactions are listed in Attachment 1.
>
> 2. In a series of Supplemental Nutrition Assistance Program EBT transactions, multiple purchase transactions were made too rapidly to be credible. These transactions are listed in Attachment 2.
>
> 3. In a series of Supplemental Nutrition Assistance Program EBT transactions, excessively large purchase transactions were made from recipient accounts.  These transactions are listed in Attachment 3.

Administrative Record (hereinafter "AR") at 38.

Attachment One to Hughes's letter lists, as violations: (1) 160 transactions of $9.00 or more with a cents value of 00; (2)

thirty-one transactions of $9.00 or more with a cents value of 50; and (3) thirty transactions of $9.00 or more with a cents value of 99.  Taking into account all transactions, not just those of more than $9.00, during September, October, and November of 2009, Rockland had 258 transactions with a cents value of 00, 105 transactions with a cents value of 50, and 135 transactions with a cents value of 99.  Those 498 same-cents transactions were 42.5 percent of Rockland's total EBT sales, while, nationwide, from March through September of 2010, only 12.6 percent of all EBT transactions were for amounts with cents values of 00, 50, and 99.[6]  Because the national norms for cents values are taken to be the pattern produced by sales of eligible food, variations from those norms are considered to be evidence that EBT benefits have been exchanged for something other than eligible food.

Attachment Two lists, as violations, twelve pairs of successive transactions conducted too rapidly to be credible. The amount of time between those twelve back-to-back transactions ranges from a low of thirty-five seconds between a

_____

[6] Regarding the three specific cents values at issue here: (1) 22 percent of Rockland's ETB sales had a cents value of 00 while, nationwide, that cents value accounted for 6.8 percent of all ETB sales; (2) 9 percent of Rockland's EBT sales had a cents value of 50 while, nationwide, that cents value accounted for 2.5 percent of all EBT sales; and (3) 11.5 percent of Rockland's EBT sales had a cents value of 99 while, nationwide, that cents value accounted for 3.3 percent of all EBT sales.

$45.74 purchase and a subsequent $40.00 purchase, and a high of

four minutes and eighteen seconds between a $40.99 purchase and

a subsequent $200.00 purchase.  A subsequent transaction is

suspicious to FNS when it appears implausible or impossible for

an employee at a store's check-out counter to have physically

handled the number of items necessary to achieve the value of

the transaction in the amount of time in which the ALERT report

says the transaction took place.[7]  FNS's conclusions regarding

Rockland's successive transactions are based on factors such as

the average cost of Rockland's eligible food items, the store's

check-out facilities, and the distance between the merchandise

and the check-out counter.

Attachment Three lists, as violations, 249 "excessively

large purchase transactions," ranging in value from $30.99 to

$233.77.  During September, October, and November of 2009,

Rockland had 170 EBT transactions of between $20.00 and $29.99,

while statewide, during the same period, convenience stores

averaged twenty such EBT transactions.  Rockland had sixteen ETB

sales of more than $100, while the statewide average was one per

store.  Rockland's record of EBT transactions involving amounts

between $30.00 and $99.99 is similarly out of line with the

---

[7] For example, in a store without an optical scanner where
there are few items costing more than five dollars, it would
seem implausible that a check-out worker could process a forty-
dollar transaction (i.e., one that involved eight or more
items), in less than forty seconds.

statewide averages for convenience stores.  Moreover, during the
three months FNS examined, Rockland's average EBT transaction
totaled $21, while, statewide, the average EBT sale was $8.15 in
convenience stores, $18.44 in small grocery stores, $17.51 in
medium-sized grocery stores, and $21.94 in large grocery stores.
According to FNS, Rockland's large number of high-dollar
transactions is evidence that Rockland was exchanging SNAP
benefits for cash rather than eligible food.  That conclusion is
supported, in FNS's view, by Rockland's meager inventory and the
low prices of its eligible food items.

    Shortly after Karki received Hughes's letter, she met with
Hughes and Svenson to explain the anomalies that Hughes had
reported to her.  To explain the high number of same-cents
transactions, she identified three items she sells at prices
that have a cents value of 00 and one item priced with a cents
value of 50.  To explain the rapid successive transactions, she
stated that customers sometimes purchase additional items after
a sale has been processed, and indicated that she had let some
customers pay on credit when they discovered that they did not
have their EBT cards with them after their sales had been rung
up.  To explain the high-dollar transactions, she mentioned a
Bhutanese festival in September and indicated that Bhutanese
extended families often shop together, resulting in large
transactions.  Subsequently, Karki sent Hughes invoices

documenting her purchases of some of her store's inventory, principally ethnic food.[8]

Hughes was not persuaded by Karki's explanations.  As a result, FNS permanently disqualified Rockland from participating in SNAP.  Hughes's letter announcing the disqualification also stated that Rockland was not eligible for a civil money penalty because Karki "failed to submit sufficient evidence to demonstrate that [her] firm had established and implemented an effective compliance policy and program to prevent violations of the Supplemental Nutrition Assistance Program."  AR at 69. Rockland appealed, but challenged only the determination that it was liable for trafficking; Rockland did not challenge the USDA's determination that it did not qualify for a civil money penalty.  By letter dated June 1, 2010, the USDA's Administrative Review Office affirmed FNS's decision to disqualify Rockland.  This appeal followed.

While it is not as clear as it might be, Rockland's appeal appears to ask the court to determine that Rockland is not liable for trafficking, or, in the alternative, that the USDA's

---

[8] Of those fifteen invoices, two appear to be duplicates. Of the remaining thirteen, seven are from August, four are from September, two are from October, and none are from November. Those invoices document purchases of $4,479.78 from Rockland's ethnic-food suppliers while, during August, September, and October of 2009, Rockland's EBT sales totaled $25,556.66.

decision to impose a permanent disqualification rather than a civil money penalty was arbitrary and capricious.

## Discussion

Defendants move for summary judgment, arguing that the undisputed factual record establishes that Rockland has trafficked in food stamps.  Rockland objects, identifying the following purported genuine issues of material fact:

> (1) reports prepared by Inspector, Phyllis Svenson, do not include accurate inventory information or square footage, (2) the three unusual patterns must not be applied as a representation of trafficking or fraud because they are directly related to sales "on-credit" (3) the Defendant, USDA, does not address or recognize the immigration influx of the Bhutanese community in the Manchester area which attributes to the significant increase in EBT sales from 2008 to 2009, and (4) Although SNAP regulations proscribe credit transactions, sales "on-credit" are not mentioned under trafficking where defined under 7 C.F.R. § 271.2., as "the "buying or selling of coupons . . . or other benefit instruments for cash or consideration other than eligible food."  However, sales "on-credit" is defined under 7 C.F.R. § 278.2 (f) which states "Food stamp benefits shall not be accepted by an authorized retail food store in payment for items sold to a household on credit.  A firm that commits such violations shall be disqualified from participation in the Food Stamp Program for a period of one year."

Pl.'s Mem. of Law (doc. no. 17-1), at 9.

To supplement the administrative record, Rockland has produced Karki's declaration, but nothing else, such as cash register tapes, see Idias, 359 F.3d at 696-97, affidavits from customers, see Mansour v. United States, No. CV F 08-1313 LJO

DLB, 2009 WL 3763778, at *11 (E.D. Cal. Nov. 9, 2009), or expert statistical analysis of the data from the ALERT report, see Young Choi, 639 F. Supp. 2d at 1181, to rebut or explain the evidence generated by FNS and produced by defendants.  To be sure, some relevant evidence is in defendants' custody and control, but, unlike the store in Rodriquez, 2011 WL 1838290, at *5 (D. Md. May 12, 2011), Rockland has not filed an affidavit for further discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.  Moreover, notwithstanding the fact that the Administrative Review Officer who issued the USDA's Final Agency Decision against Rockland expressly noted Rockland's failure to produce ledgers or other evidence of the credit Rockland claims to have extended to its Bhutanese customers, see AR at 155, Rockland has produced no such evidence in this forum despite its clear right to "offer any relevant evidence available to support [its] case, whether or not it has been previously submitted to the agency."  Kim, 121 F.3d at 1272 (quoting Redmond, 507 F.2d at 1011-12).  Accordingly, the summary judgment record is limited to the administrative record, the evidence defendants have produced, and Karki's declaration.

While there appear to be several problems with Rockland's putative factual disputes[9] there is no good reason not to proceed

---

[9] It is not clear that number (1) identifies a material fact, and the record demonstrates that the square footage

straight to the heart of the matter, Rockland's argument that "[t]his is a case where a food stamp vendor accepted payment for items sold to households on credit, and the punishment should be disqualification for only one year under 7 C.F.R. § 278.2(f)."[10] Pl.'s Mem. of Law (doc. no. 17-1), at 11; see Idias, 359 F.3d at 699 (noting disqualified store's strategy of attempting to trade one offense for another).

In light of the foregoing, Rockland must show, by a preponderance of the evidence, that it is liable for accepting EBT benefits to cover the cost of eligible food sold on credit, rather than accepting those benefits in exchange for cash or items other than eligible food.  In opposition to defendants' summary judgment motion, it is Rockland's burden to produce evidence that creates a genuine dispute over the USDA's determination that the three unusual EBT acceptance patterns it identified are evidence of trafficking rather than evidence of the use of EBT cards to make payments on credit accounts.

---

reported for Rockland came from Karki herself, not Svenson. Number (3) does not appear to be supported by any admissible evidence.  And, numbers (3) and (4) seem to be legal arguments rather than factual disputes.

[10] This appears to be a new position, given that Rockland's complaint asked the court to determine that it did not violate the Food Stamp Act, or, if it did, that the proper sanction was a civil money penalty.  A civil money penalty, however, is a sanction for trafficking, not for accepting SNAP benefits to pay for items sold on credit, the violation to which Rockland now admits.

Rockland acknowledges its burden, and claims to have carried it by "explaining that each unusual pattern was as a result of selling food items on credit."  Pl.'s Mem. of Law (doc. no. 17-1), at 11.  Taken at face value, Rockland's memorandum of law appears to disclaim any reliance on the shopping patterns of Bhutanese extended families and the dates of Bhutanese holidays to explain the benefit-acceptance patterns at issue here.

Defendants have identified several hundred suspect transactions, each of which it has deemed to be an instance of trafficking.  It is indisputable that the kind of evidence on which defendants rely, i.e., the ALERT reports, qualifies as proof of trafficking, and that a "court may grant the government's motion for summary judgment based on evidence from transaction reports," Young Choi, 639 F. Supp. 2d at 1178.  It is also important to bear in mind that even a single incident of trafficking is enough to justify permanent disqualification. See 7 U.S.C. 2021(b)(3)(B); Kahin, 101 F. Supp. 2d at 1303. Rockland does not argue that the ALERT reports are inaccurate, but only challenges the conclusion that its same-cents transactions, rapid successive transactions, and high-dollar transactions resulted from trafficking.

As a preliminary matter, Rockland's objection to summary judgment suffers from a significant lack of specificity.  In an appeal from a USDA disqualification decision, "[t]o defeat a

motion for summary judgment, the nonmoving party needs to raise material issues of fact [as] to every alleged violation charged against it." Young Choi, 639 F. Supp. 2d at 1178.  Because summary judgment may be defeated only when the plaintiff identifies a genuine factual dispute as to each alleged violation, general statements about ethnic shopping patterns or other cultural practices are not enough create a triable issue of fact. See Young Choi, 639 F. Supp. 2d at 1179-81.  In reliance on Kahin, the district judge in McClain's Market granted summary judgment to the government after observing: "Hubbard's affidavit presents no explanation of any of the 149 transactions asserted against plaintiff, but merely presents general justifications for large expenditures.  Any one of the 149 transactions is sufficient to establish a violation."  411 F. Supp. 2d at 777.  Here, Rockland has produced nothing other than the kinds of generalizations ruled to be inadequate in Kahin, Young Choi, and McClain's Market.  Having described the overall insufficiency of Rockland's objection, the court turns more specifically to Rockland's argument against summary judgment.

### A. Same-Cents Transactions

Defendants argue that a statistically large number of same-cents transactions is evidence of trafficking because sales of

eligible food items would produce a more random cents-value
distribution, in line with the standard distribution of cents
values from EBT transactions nationwide.  Rockland contends that
its unusual pattern of same-cents transactions results from
sales on credit.[11]  In its memorandum of law, Rockland argues
that "[i]t is human inclination for [a] Bhutanese customer to
make a partial payment [on a credit account] that would end in
$0.00, such as a $50.00 or $60.00 payment."  Pl.'s Mem. of Law
(doc. no. 17-1), at 6.  Rockland, however, produces no evidence
on this point; Karki's declaration says nothing about the cents
values of payments made on credit accounts, other than noting
her practice of rounding down the amount owed on a purchase or a
credit payment to an even-dollar figure.  Accordingly, Rockland
has failed to create a genuine issue of material fact pertaining
to the sole theory advanced in its objection to summary
judgment, its argument that Rockland's unusually large number of
same-cents transactions result from the store's admittedly

---

[11] As a "throw-in" argument, Rockland points out that Karki
told Hughes and Svenson that Rockland would sometimes give its
customers a "round-figure" discount, to even out the amount due
in transactions that would otherwise have resulted in the
payment of an odd number of cents.  While Karki averred in her
administrative appeal that Rockland's round-figure discount
could result in transactions with cents values of 00, 50, and
99, she backs off from that position in her declaration,
testifying only that she would round down to a cents value of
00.  Thus, the round-figure discount does not account for the
several hundred transactions with cents values of 50 and 99.

unlawful practice of extending credit to its customers, rather than from trafficking in SNAP benefits.

Even accepting Rockland's unsupported argument about payments on credit accounts, i.e., that its customers prefer to make credit payments in increments of $10.00, there remain dozens of transactions with a cents value of 00 for amounts other than even increments of $10.00.  Attachment One to Hughes' letter to Rockland documented thirteen transactions of $11.00 each, eight of $12.00, four of $13.00, six of $14.00, ten of $15.00, six of $16.00, three of $17.00, four of $18.00, one of $19.00, one of $21.00, one of $22.00, two of $13.00, five of $25.00, four of $16.00, one of $27.00, two of $28.00, two of $29.00, three of $31.00, one of $32.00, one of $35.00, two of $36.00, one of $39.00, one of $41.00, two of $42.00, four of $43.00, three of $44.00, one of $45.00, one of $46.00, two of $47.00, two of $48.00, one of $49.00 transaction, and one of $88.00.  Plainly, Rockland's $10.00/$20.00/$30.00 credit-payment theory does not account for those ninety-nine transactions. And, that theory does not account for the 105 transactions with cents values of 50 or the 135 transactions with cents values of 99.

While Rockland's memorandum of law presents no argument to explain transactions with cents values of 50 and 99, Karki attempts to do so in her declaration.  First, she says that

"many" of the items Rockland purchases from its vendors have
cents values of 00 of 50, and that Rockland's even-dollar mark-
ups often result in items for sale to customers with cents
values of 00 and 50.  Karki does not quantify "many," nor does
she suggest that Rockland purchases substantially more items
from its vendors with cents values of 00 and 50 than the stores
whose sales serve as the baseline for FNS's analysis of same-
cents anomalies.  Thus, her argument is not persuasive.

Moreover, Karki's declaration, which consists largely of
theories only loosely tied to actual evidence, is weaker, by
several orders of magnitude, than the evidence typically
produced to rebut charges of trafficking based on patterns of
same-cents transactions.  For example, in Rodriguez, "[t]he
Grocery . . . presented evidence that over 100 SNAP-eligible
items in its inventory end in .00, .25, or .50."  2011 WL
1838290, at *8.  In Skyson USA, LLC v. United States, the FNS
charged a food store with trafficking based, in part, on a large
number of transactions in amounts that had a cents value of 98,
and the store produced evidence that at least 101 of the 113
food items it sold had prices with a cents value of 98.  Civ.
No. 09-00278 BMK, 2010 WL 651032, at *8 (D. Haw. Feb. 22, 2010).
Here, in its initial response to FNS's charge letter, Rockland
identified three items with prices that had a cents value of 00
and one item with a price that had a cents value of 50.  Beyond

that, Rockland has produced no further evidence on the prices of
its merchandise.  Rather, Rockland relies almost exclusively on
Karki's vague speculation, and her reference to Rockland's
invoices says nothing about the 135 transactions with cents
values of 99.

Regarding transactions with a cents value of 99, Karki
says: "As far as multiple transactions ending in .99, a customer
wishing to make a payment ending in .00 may have added-on the
cost of a smaller purchase, resulting in a .50 or .99 cent
ending EBT transaction."  Pl.'s Obj. to Summ. J., Karki Decl.
(doc. no. 17-2), at 5.  Karki's explanation makes no sense.  A
$4.99 purchase standing alone and a $4.99 purchase combined with
a $20.00 payment on a credit account both result in transactions
for amounts with a cents value of 99.  In other words, the
addition of even-dollar credit-account payments has <u>no</u> bearing
on the relative frequency of any given cents value.  Further-
more, unlike the store in <u>Skyson</u>, which produced evidence that a
large majority of its merchandise had prices with exactly the
cents value identified by FNS as suspicious, Rockland has
identified no individual item in its inventory, and no
combination of items, that would result in sales with cents
values of 99.[12]  Thus, Karki's theory about the combination of

---

[12] To be fair, Svenson's visit to Rockland did uncover one
item with a price that had a cents value of 99.

actual purchases with payments on credit accounts does nothing
to explain FNS's finding that Rockland has transactions with a
cents value of 99 at a rate more than three times the national
average.

In sum, Rockland has failed to produce evidence sufficient
to create a genuine issue of material fact in support of its
claim that all of its same-cents transactions beyond the
national norm resulted from the extension of credit rather than
trafficking in ETB benefits.  Accordingly, defendants are
entitled to judgment as a matter of law on Rockland's appeal
from the USDA's disqualification decision.

B. Other EBT Anomalies

Having determined that defendants are entitled to summary
judgment, there is no need to determine whether Rockland has
created a triable issue of fact regarding its assertions that
the twelve rapid successive transactions and the 249 high-dollar
transaction FNS identified all resulted from the settlement of
credit accounts rather than trafficking.  Even so, the court
makes the following observations about Rockland's arguments.

First, they are beset with troubling inconsistencies.  For
example, in its explanation for rapid successive transactions,
it argues that in one pair of transactions made with the same
EBT card – a $45.74 transaction followed immediately by a $40.00

27

transaction – the first transaction was a purchase of food while the second was a payment on a credit account.  Having established that pattern, i.e., one card swipe to purchase food followed immediately by a second card swipe to make a payment on a credit account, Rockland than argues that a transaction for $106.43 included both a payment for contemporaneously purchased food and a payment on a credit account accomplished with a single card swipe.  Rockland does not explain why some payments on credit accounts would be made seconds after but separately from payments for food while others would be combined with payments for food.

There are additional problems with Rockland's argument that high-dollar and/or even-dollar transactions represent payments on credit accounts.  Rockland's basic argument is that it extended credit to many of its Bhutanese customers which allowed them to shop weekly but pay monthly, when funds became available in their EBT accounts.

It seems clear that EBT accounts are replenished monthly. See Hanna, 2007 WL 1016988, at *1 ("Each month, additional food stamp benefits are credited to a recipient's account, and these benefits are accessible through the recipient's EBT card."). But Rockland does not indicate when in the month those funds become available to its customers.  See, e.g., Hajifarah, 779 F. Supp. 2d at 194 (explaining that "[i]n Maine, SNAP benefits are

distributed on the ninth through the twelfth or thirteenth of each month"); Kahin, 101 F. Supp. 2d at 1301 ("Plaintiff alleged that the Somali families . . . purchase their entire monthly food supply at the beginning of the month when the food stamps are first available; thereby explaining the large transactions and balance depletions"); United States v. 1700 Duncanville Rd., 90 F. Supp. 2d 737, 739 (N.D. Tex. 2000) (explaining that in Texas, "[f]ood stamp benefits are electronically added to the recipient's [EBT] card at the beginning of each month. Necessarily, then, Rockland has not even attempted to show a correlation between the dates of its high-dollar, even-dollar, or $10.00/$20.00/$30.00 transactions and the date(s) on which SNAP benefits are credited to EBT accounts.  And, as the court has already noted, Rockland has produced no documentary evidence, such as ledgers, that would positively identify specific payments on credit accounts.[13]

Moreover, while Rockland bases its argument on monthly payments on credit accounts for food purchased weekly, Karki also says this, in her declaration:

_____

[13] Given that Karki holds a Masters degree in accounting, one would presume that if Rockland did, indeed, extend credit in the way it says it does, Karki would have maintained, and Rockland would have produced, persuasive documentation of the practices that are so crucial to its claim.

> On-credit payments were typically made by customers
> one time per month.  However, on some occasions
> customers chose to make more than one on-credit
> payment towards their credit balance.

Pl.'s Obj. to Summ. J., Karki Decl., at 4.  Thus, as Karki

explains things, even-dollar payments clustered around the time

benefits are available and even-dollar payments spread across

the month are both evidence of Rockland's credit policy rather

than evidence of EBT benefit trafficking.  Unsupported by

anything other than Karki's vague say-so, Rockland's argument

that all of its EBT anomalies resulted from payments on credit

accounts strains credulity.

### C. Household 7212

The court concludes by focusing on the EBT record of a

single household that shopped at Rockland and used an EBT card

with the last four digits 7212.  During the months of September,

October, and November of 2009, card 7212 was used for at least

the following transactions:

| | | |
|---|---|---|
| September 6 | | $100.68 |
| September 13, | 7:38:02 a.m. | $39.00 |
| September 13, | 7:40:36 a.m. | $78.97 |
| September 20, | 12:03:35 p.m. | $35.49 |
| September 20, | 12:05:51 p.m. | $23.00 |
| September 20, | 12:16:58 p.m. | $40.00 |
| September 27, | 1:31:39 p.m. | $31.88 |
| September 27, | 1:32:29 p.m. | $25.00 |
| October 4 | | $39.50 |
| October 10, | 9:26:18 a.m. | $56.42 |
| October 10, | 9:27:31 a.m. | $39.99 |
| October 19 | | $55.49 |
| November 8 | | $115.89 |

        November 21      8:24:44 a.m.         $56.60
        November 21      8:26:30 a.m.         $35.00

AR at 40-43, 47-51.  None of Rockland's various theories about

its extension of credit to its Bhutanese customers, individually

or in concert, come anywhere close to explaining the foregoing

set of transactions, which includes: (1) seven same-cents

transactions (involving all three of the cents values identified

by FNS as problematic); (2) four pairs of transactions conducted

less than three minutes apart; and (3) fifteen transactions

larger than the average EBT transaction at a large New Hampshire

grocery store, including six that were more twice as large,

three that were more than three times as large, two that were

more than four times as large, and one that was more than five

times as large as the average EBT purchase at a large New

Hampshire grocery store.

     Plainly, 7212 was not a weekly shopper making monthly

payments.  Turning to September 13, presuming that the $39.00

transaction at 7:38:02 a.m. was a payment on a credit account,

it is difficult to see how a cashier could have possibly

processed $78.97 worth of Rockland merchandise in two minutes

and thirty four seconds.  But, it is equally difficult to

understand why, at 7:40:36 a.m., 7212 would have combined a

small purchase with a large payment on a credit account, to

reach the amount of $78.97, in light of the $39.00 credit-

account payment that had been made less than three minutes
earlier.

September 20 is even more inexplicable.  Rockland's best-
case scenario is that the $35.49 transaction at 12:03:35 p.m.
was a food purchase, followed two minutes and sixteen seconds
later by $23.00 even-dollar payment on a credit account.  But,
Rockland's various theories offer no good explanation for the
$40.00 transaction approximately eleven minutes after the $23.00
transaction.  According to Rockland's $10.00/$20.00/$30.00
theory, the $40.00 transaction would be the quintessential
credit-account payment, but it would seem very strange for 7212
to have made two credit-account payments within eleven minutes
of each other.  But, if the $23.00 transaction was not a credit-
account payment, then, according to Rockland, it must have been
a payment for food.  A $23.00 food purchase at 12:05:51 p.m. on
September 20, however, would have be unusual by virtue of its
size (larger than the average EBT purchase at large New
Hampshire grocery store), its even-dollar cents value, and its
timing (coming two minutes and sixteen seconds after a $35.49
transaction).

In sum, based upon the activities of 7212 alone, during the
month of September, 2009, defendants have produced substantial
evidence of trafficking in SNAP benefits and Rockland has failed
to produce evidence to create a triable issue of fact on those

violations – not to mention the several hundred others on which its disqualification was based.

### D. Sanction

Having determined that defendants are entitled to summary judgment on Rockland's claim that it is not liable for trafficking, all that remains is the question of the sanction imposed by the USDA.  In its complaint, Rockland asked the court to find that even if it is liable for violating the Food Stamp Act, the USDA acted in an arbitrary and capricious manner by imposing a permanent disqualification rather than a civil money penalty.  The complaint, however, alleges no facts that would support the imposition of a civil money penalty under 7 U.S.C. § 2021(b)(3)(B).  Moreover, the only mention of sanctions in Rockland's objection to summary judgment is its request for the one-year disqualification required by 7 C.F.R. § 282.2(f), when a store is determined to be liable for accepting SNAP benefits to pay for items purchased on credit.  Thus, Rockland appears to concede that if it is liable for trafficking, it has no basis for seeking a civil money penalty in lieu of disqualification. In any event, it has produced no evidence to create a triable issue of fact with regard to its entitlement to a civil money penalty.  Because the undisputed factual record demonstrates that Rockland is not entitled to the imposition of a civil money

penalty for its trafficking violation, defendants are entitled
to judgment as a matter of law on Rockland's claim as it relates
to the issue of sanctions.

**Conclusion**

For the reasons given, defendant' motion for summary
judgment, document no. 13, is granted.  The clerk of the court
shall enter judgment in accordance with this order and close the
case.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge


October 27, 2011

cc:  James W. Craig, Esq.
     T. David Plourde, Esq.